Elizabeth Brannen (SBN 226234)
ebrannen@stris.com
John Stokes (SBN 310847)
jstokes@stris.com
Lauren Martin (SBN 294367)
lmartin@stris.com
**STRIS & MAHER LLP**
17785 Center Court Dr N, Ste 600
Cerritos, CA 90703
T: (213) 995-6800 | F: (213) 261-0299

Christopher M. Rigali (*pro hac vice*)
crigali@stris.com
Jacqueline Sahlberg (*pro hac vice*)
jsahlberg@stris.com
**STRIS & MAHER LLP**
1717 K St NW Ste 900
Washington, DC 20006
T: (202) 800-5749

Bridget Asay (*pro hac vice*)
basay@stris.com
**STRIS & MAHER LLP**
15 East State Street, Ste 2
Montpelier, VT 0560s2
T: (802) 858-4285

Kyle Roche (*pro hac vice*)
kroche@fnf.law
Devin (Velvel) Freedman (*pro hac vice*)
vel@fnf.law
Alex Potter (*pro hac vice*)
apotter@fnf.law
**FREEDMAN NORMAND
FRIEDLAND LLP**
155 E. 44th Street, Ste 915
New York, NY 10017
T: (646) 494-2900

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CAMBRONNE INC., LISA BARRETTA, PHILIP SHISHKIN, JANE ADAMS, MATTHEW SACKS, and MICHAEL KOCHIN,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC; GOOGLE LLC; OPENAI, INC.; OPENAI OPCO LLC; OPENAI GP LLC; OPENAI GLOBAL LLC; OAI CORPORATION LLC; OPENAI HOLDINGS LLC; META PLATFORMS, INC.; XAI CORPORATION; PERPLEXITY AI, INC.; APPLE, INC.; and NVIDIA CORPORATION,<br><br>Defendants. | Case No. 5:2025-cv-10897-PCP<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO SEVER**<br><br>Date:    April 9, 2026<br>Time:    10:00 AM<br>Crtrm.:  Courtroom 8<br>Judge:   The Honorable P. Casey Pitts<br><br>Trial Date:         None<br>Date Action Filed:  December 22, 2025 |

5:2025-cv-10897-PCP

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................................1

II.   STATEMENT OF PERTINENT FACTS ............................................................................2

III.  LEGAL ARGUMENT ..........................................................................................................6

    A.    Plaintiffs' Claims Arise from the Same Series of Transactions or Occurrences ...............................................................................................................................8

    B.    Common Questions of Law and Fact Predominate.......................................................9

    D.    Cases Cited In Defendants' Briefing Are Distinguishable ........................................13

    E.    Defendants' Remaining Arguments Lack Merit ..........................................................14

    F.    Severance Would Prejudice Plaintiffs .........................................................................16

    G.    In the Alternative, This Court Should Immediately Consolidate Any Actions Not Deemed Related to Other Pending Cases .............................................................17

IV.   CONCLUSION ...................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Fulton Cnty.*,
    207 F.3d 1303 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*,
    338 F.3d 1304 (11th Cir. 2003) (en banc) ................................................................................. 8

*Almont Ambulatory Surgery Center, LLC v. UnitedHealth Group, Inc.*,
    99 F. Supp. 3d 1110 (C.D. Cal. 2015) ............................................................................. *passim*

*Am. Small Bus. League v. United States Off. of Mgmt. & Budget*,
    No. 20-CV-07126-DMR, 2021 WL 4459667 (N.D. Cal. Apr. 21, 2021) ............................... 18

*Arteris S.A.S. v. Sonics, Inc.*,
    No. C 12-0434-SBA, 2013 WL 3052903 (N.D. Cal. June 17, 2023) ..................................... 18

*Barnes v. Shartle*,
    No. CV-18-00491-TUC-CKJ, 2019 WL 4040355 (D. Ariz. Aug. 27, 2019) ......................... 17

*Bartz v. Anthropic PBC*,
    787 F. Supp.3d 1007 (N.D.Cal., 2025) ................................................................................. 10

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ................................................................................................................. 2

*Campbell v. City of Los Angeles*,
    903 F.3d 1090 (9th Cir. 2018) .................................................................................................. 7

*Coughlin v. Rogers*,
    130 F.3d 1348 (9th Cir. 1997) ..................................................................................... 7, 13, 14

*DIRECTV, Inc. v. Hosey*,
    289 F. Supp. 2d 1259 (D. Kan. 2003) .................................................................................... 15

*In re EMC Corp.*,
    677 F.3d 1351 (Fed. Cir. 2012) ............................................................................................... 8

*Hard Drive Productions, Inc. v. Does 1-188*,
    809 F. Supp. 2d 1150 (N.D. Cal. 2011) ................................................................................. 13

*Harper & Row Publishers, Inc. v. Nation Enter.*,
    471 U.S. 539 (1985) ......................................................................................................... 10, 11

*Hubbard v. Houghland*,
    No. 09-0939, 2010 WL 1416691 (E.D. Cal. Apr. 5, 2010) ...................................................... 8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER

*League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*,
    558 F.2d 914 (9th Cir. 1977) ............................................................ 2, 6, 7, 11

*Lindora, LLC v. Isagenix Int'l, LLC*,
    198 F. Supp. 3d 1127 (S.D. Cal. 2016) ................................................................ 8

*Make-A-Friend, Inc. v. Bear Mill, Inc.*,
    No. CV07-276-N-EJL, 2007 WL 9751835 (D. Idaho Oct. 26, 2007) ................................... 17

*McGucken v. Pub Ocean Ltd.*,
    42 F.4th 1149 (9th Cir. 2022) .......................................................................... 11

*Moore v. N.Y. Cotton Exch.*,
    270 U.S. 593 (1926) ..................................................................................... 8

*Mosley v. Gen. Motors Corp.*,
    497 F.2d 1330 (8th Cir. 1974) ........................................................................ 7, 8

*Pablo Sequen v. Kaiser*,
    No. 25-CV-06487-PCP, 2025 WL 3275602 (N.D. Cal., Nov. 24, 2025) ................................ 7, 8

*Russo v. Fed. Med. Servs., Inc.*,
    756 F. Supp. 3d 748 (N.D. Cal. 2024) ............................................................... 7, 15

*San Francisco Tech., Inc. v. Adobe Sys. Inc.*,
    No. C 09-6083 RS, 2010 WL 1463571 (N.D. Cal. Apr. 13, 2010) ...................................... 18

*Smith v. Trexler*,
    No. 13-CV-01052-SBA (PR), 2016 WL 925851 (N.D. Cal. Mar. 11, 2016) ............................... 18

*United Mine Workers of America v. Gibbs*
    383 U.S. 715 (1966) .................................................................................... 12

*Wynn v. National Broadcasting Company*,
    234 F. Supp. 2d 1067 (C.D. Cal. 2002) ............................................................. 8, 17

**Rules**

Fed. R. Civ. P. 20 ..........................................................................................*passim*

Fed. R. Civ. P. 20(a)...................................................................................... 6, 7

Fed. R. Civ. P. 20(a)(2) ................................................................................... 7, 9

Fed. R. Civ. P. 20(a)(2)(A)................................................................................... 15

Fed. R. Civ. P. 20 (a)(2)(B)................................................................................... 7

Fed. R. Civ. P. 21 ...................................................................................... 7, 18

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER

Fed. R. Civ. P. 26(c) ..................................................................................................... 15

Fed. R. Civ. P. 42 ......................................................................................................... 17

Fed. R. Civ. P. 42(a) .............................................................................................. 17, 18

**Treatises**

9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2382
    (3d ed. rev. 2025) ..................................................................................................... 18

7 Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* §
    1653 (3d ed. rev. 2014) ............................................................................................. 7

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER

Plaintiffs respectfully submit their consolidated Memorandum in Opposition to Defendants' respective Motions to Sever. *See* ECF No. 95 ("Plaintiffs' opposition to the various motions to sever may be filed as one opposition against all pending motions to sever."); *see also* Defendants' Motions To Sever at ECF No. 94 ("Google Mot."), ECF No. 106 ("Anthropic Mot."), ECF No. 112 ("Perplexity Mot."), ECF No. 114 ("Meta Mot."), and ECF No. 115 ("xAI joinder").

## I.  INTRODUCTION

Defendants ask this Court to fracture a single, cohesive case into a series of duplicative lawsuits—each requiring the same discovery, the same experts, and the same legal rulings on critical questions. Rule 20 does not permit that result. The party seeking severance bears the burden of showing that the claims do not arise from the same series of transactions or occurrences and do not present common questions of law or fact. Defendants have not met this burden and the Court should deny these motions.

This case arises from a single, industry-wide course of conduct: the systematic use of pirated "shadow libraries" to acquire copyrighted books and train and fuel their generative AI models without authorization. Plaintiffs allege that each Defendant—though competitors—participated in the same underlying scheme by drawing from the same interconnected ecosystem of piracy repositories, including LibGen, Z-Library, Bibliotik, and derivative datasets such as Books3 and *The Pile*. Am. Compl. ¶¶ 45–189.

Defendants attempt to recharacterize this case as a collection of unrelated acts by independent actors. But the Amended Complaint alleges the opposite: a common factual nucleus in which each Defendant (1) sourced copyrighted works from the same piracy ecosystem, (2) used those works in materially similar training pipelines, and (3) commercialized AI systems built on those unlawfully obtained inputs. *Id.* ¶¶ 119–189. The fact that Defendants used different combinations of pirated datasets or developed different AI products does not defeat joinder. What matters under Rule 20(a)(2) is that Defendants' conduct reflects a systematic pattern of behavior— an industry-wide policy of exploiting shadow libraries—that ties the claims together and presents common questions of law and fact.

Those common questions are not abstract—they go to the core of Defendants' principal

1                                                    5:2025-cv-10897-PCP

defense: fair use. One of the most important fair use factors is the effect of the use on the potential market for the copyrighted works, including the emerging market for licensing data for AI training. Courts must "consider not only the extent of market harm caused by the particular actions of the alleged infringer, ***but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original.***" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (quoting Nimmer § 13.05). Each Defendant is therefore not merely a litigant but a central market participant whose conduct bears directly on that analysis. Severance would therefore not simplify the case—it would multiply it: each Defendant would be required to appear as a third-party witness in parallel actions to testify about the same market dynamics, exponentially increasing the burden on the Parties and the Court.

Permitting joinder serves the core purposes of Rule 20: promoting judicial economy, avoiding duplicative litigation, and ensuring consistent adjudication of related claims. *See League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977). Severance, by contrast, would require this Court and the parties to relitigate the same foundational issues—the nature and provenance of the piracy ecosystem, the scope of fair use for AI training, and the standard for willfulness—across multiple proceedings. This is precisely the inefficiency and inconsistency that Rule 20 is designed to prevent.

## II.    STATEMENT OF PERTINENT FACTS

This action arises from a single, industry-wide course of conduct in which competing artificial intelligence companies acquired and copied the same category of copyrighted works—books—from the same set of piracy repositories and then used those unlicensed copies in materially similar training pipelines to build and commercialize, at a massive scale, large language models ("LLMs") that compete with each other. Am. Compl. ¶¶ 2–3, 10.

Plaintiffs are professional authors and rights holders whose books are registered and protected under the Copyright Act. *Id.* ¶¶ 27–33. Their works were copied, ingested, and embedded into the Defendants' commercial models without permission or compensation. *Id.* ¶¶ 2–9, 56–58, 233–235. Plaintiffs allege that all Defendants engaged in the same series of transactions or occurrences: they targeted long-form books because books confer unique modeling value; they

obtained those books from the same shadow libraries and standardized datasets derived from those libraries; and they repeatedly reproduced those works through the same technical steps of ingestion, preprocessing, storage, and iterative model training and deployment. *Id.* ¶¶ 2–9, 52–58. Each Defendant appropriated Plaintiffs' books from the same illicit sources to accelerate model development and then made additional unlicensed copies through the common technical processes necessary to train, deploy, and/or optimize their LLMs, thereby infringing Plaintiffs' exclusive rights. *Id.* ¶¶ 2–9, 17, 233–235. The claims therefore share a unifying factual nucleus and present common questions of law and fact across all Defendants, notwithstanding that they are competitors in the generative-AI marketplace. *Id.* ¶¶ 10–17.

More specifically, the Amended Complaint alleges that Defendants obtained Plaintiffs' copyrighted works from an interconnected network of shadow libraries that share pirated content. *Id.* ¶¶ 58–109. The Amended Complaint traces this common conduct to a single, well-defined genesis and documents how it propagated in a uniform way across the industry. *Id.* ¶¶ 11–16. In 2018, an OpenAI employee downloaded pirated copies of books from Library Genesis ("LibGen") and used them to create the internal datasets that OpenAI later labeled Books1 and Books2. *Id.* ¶¶ 11, 68–72. At that time, LibGen was the largest shadow library in the world and served as the central hub of this piracy ecosystem. *Id.* ¶ 64.

OpenAI then trained GPT-3 on those LibGen-derived book corpora. *Id.* ¶¶ 11, 68–72. Within weeks of GPT-3's release, the open-source collective EleutherAI formed and assembled *The Pile*, a general-purpose dataset designed to replicate GPT-3-style training. *Id.* ¶¶ 12, 74–78. Because OpenAI kept the composition of its book corpora secret, EleutherAI and other researchers constructed a substitute book dataset—Books3—by copying approximately 200,000 copyrighted books from the Bibliotik shadow library and packaged Books3 as a subset of *The Pile* expressly for reuse in large-scale model training. *Id.* ¶¶ 12–13, 74–91.

The remaining Defendants followed the same path and turned to the same piracy repositories. *Id.* ¶¶ 13–16. As the generative-AI arms race intensified, Defendants who had relied on *The Pile* and Books3 sought ever-larger volumes of book-length texts and expanded to additional shadow libraries, including LibGen, Z-Library, and Anna's Archive. *Id.* ¶¶ 14–15. That is, the

3

Amended Complaint details how these shadow libraries are not independent repositories but a single, interlocking system. This interconnection is critical: it means that Defendants' acquisition of training data from any of these sources constitutes participation in the same piracy ecosystem.

The Defendants knew or should have known these repositories were illicit because they had been targeted by law enforcement and civil actions, publicly described as piracy hubs, and mirrored specifically for bulk download. *Id.* ¶¶ 14, 61, 64–67, 92–94, 103–109. Yet Defendants pressed forward because pirated books offered speed, cost savings, and performance advantages unavailable through lawful licensing. *Id.* ¶¶ 8–9, 14–16, 123–129, 135–140, 146–149, 157–160, 171–175, 183–189, 209–212, 223–230.

Plaintiffs were individually harmed because their works are contained in pirated online libraries—including *The Pile*, Books 3, LibGen, Z-Library, and Anna's Archive—or from standardized datasets derived from those libraries. *Id.* ¶¶ 13–16, 34–41. Defendants have directly or indirectly downloaded books illegally contained in *The Pile*, Books 3, LibGen, Z-Library, and Anna's Archive. This is not in dispute. For example:

- Anthropic has admitted to using "internet books" and other material "sourced from The Pile" as a portion of its training dataset for its LLMs.[1]

- Meta admits that it downloaded pirated copies of Plaintiffs' books from shadow-library websites such as LibGen and Z-Library and has admitted to including the Gutenberg Project and the Books3 section of *The Pile* in its data training set.[2]

- Perplexity has been alleged to, based on forensic evidence, routinely crawl, copy, and store expressive content in violation of copyright law.[3] Independent investigations corroborate this allegation and show that even when a website explicitly blocks

---

[1] *See* Amanda Askell et al., *A General Language Assistant as a Laboratory for Alignment*, arXiv, at 27 (Dec. 9, 2021), https://arxiv.org/pdf/2112.00861.

[2] *See* ECF 109 ("Meta's Answer") at ¶¶ 2–3, 82–83; Am. Compl. ¶¶ 152–154; Hugo Touvron et al., *LLaMA: Open and Efficient Foundation Language Models*, arXiv, at 2 (Feb. 27, 2023), https://arxiv.org/pdf/2302.13971.

[3] Complaint, *The New York Times Company v. Perplexity AI, Inc.*, 1:25-cv-10106 (S.D.N.Y. Dec. 5, 2025), ECF No. 1 at 3–4.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER

Perplexity, Perplexity may still "surreptitiously scrap[e]" and recapitulate content that is not publicly available.[4]

This common sourcing gave rise to common technical acts of copying that are inherent in the training of LLMs. Am. Compl. ¶¶ 5–8, 17, 121, 134, 144, 152, 169, 182, 206, 220-221, 233–235. Because training necessarily involves repeated exposure to and manipulation of the underlying text, each pass creates additional unlicensed reproductions of the same copyrighted books. *Id.* ¶¶ 5–8, 17, 233–235. As a result, each Defendant made at least two sets of unauthorized copies of each book: first, when acquiring the pirated books from shadow libraries or datasets derived from them; and second, when reproducing the works during ingestion, preprocessing, storage, deduplication, tokenization, and iterative training and/or fine-tuning. *Id.* ¶¶ 5–8, 17, 121, 134, 144, 152, 169, 182, 206, 220–221, 233–235. Each Defendant also embedded those copyrighted works into models' parameters that enable reproduction of protected text (and/or used those works to optimize their products). *Id.* ¶¶ 110–118.

These processes embed near-verbatim copies of books within model parameters, such that several Defendants' production models can reproduce copyrighted works in response to ordinary prompts or with minimal jailbreak techniques, demonstrating the persistent presence of the copied text across models built on the same category of unlawfully obtained training data. *Id.* ¶¶ 110–118.

Because of the systemic exploitation of the pirate libraries, Plaintiffs suffered the same kind of copying injury. *Id.* ¶¶ 18, 53–58, 233–235. The Amended Complaint alleges a single type of harm to Plaintiffs common to all Defendants. *Id.* ¶¶ 18, 53–58. Plaintiffs invested years in creating the copyrighted books that Defendants copied in seconds and then embedded in their models for ongoing monetization. *Id.* ¶¶ 18, 53–58. By using pirated books rather than obtaining licenses, Defendants deprived Plaintiffs of bargaining power and participation in the emerging derivative market for training data, and they continue to capitalize on Plaintiffs' works across consumer products, enterprise tools, and cloud platforms. *Id.* ¶¶ 18, 53–58.

---

[4] Dhruv Mehrotra & Tim Marchman, *Perplexity Is a Bullshit Machine*, WIRED (June 19, 2024), https://www.wired.com/story/perplexity-is-a-bullshit-machine/.

Defendants' choices were willful and commercially motivated in the same way as one another. *Id.* ¶¶ 8–9, 123–129, 135–140, 146–149, 157–160, 171–175, 183–189, 209–212, 223–230. The repositories at issue were widely flagged as piracy hubs through criminal prosecutions, civil injunctions, and domain seizures; industry personnel raised internal red flags; and yet Defendants persisted because pirated books were the fastest, cheapest path to competitive models and multi-billion-dollar product ecosystems. *Id.* ¶¶ 8–9, 14–16, 61, 64–67, 92–94, 103–109.

These allegations pose common questions central to every Defendant: whether acquiring books from shadow libraries and their derivatives constitutes infringement; whether the ingestion, preprocessing, training, and fine-tuning steps necessarily create unlicensed reproductions; whether models that can reproduce copyrighted text embody embedded copies of those works; and whether this conduct was willful. *Id.* ¶¶ 5–9, 17, 110–118, 233–235.

In sum, the Amended Complaint does not allege coincidental parallel conduct by Defendants. The AI industry adopted a common approach to training data acquisition: exploit shadow libraries to obtain vast quantities of copyrighted text without paying authors or publishers. *Id.* ¶¶ 51–109. Defendants' internal communications, public statements, and technical documentation demonstrate awareness that this approach entailed using pirated content. *Id.* ¶¶ 76–150. The Amended Complaint alleges that this conduct was willful, systematic, and an industry-wide scheme with a common origin, shared sources, uniform technical copying, and parallel commercialization.

## III.   LEGAL ARGUMENT

Federal Rule of Civil Procedure 20(a)(2) permits joinder of defendants where: (1) the claims against the defendants "aris[e] out of the same transaction or occurrence"; and (2) some "question of law or fact common to all the parties will arise in the action." "Rule 20 . . . is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League to Save Lake Tahoe*, 558 F.2d at 917 (citation modified). The requirements of Rule 20(a) "are not rigid tests, but rather are flexible concepts used by the courts to implement the purpose of Rule 20 and therefore are to be read as broadly as possible whenever doing so is likely to promote judicial economy." *Almont Ambulatory Surgery Center, LLC*

*v. UnitedHealth Group, Inc.*, 99 F. Supp. 3d 1110, 1188 (C.D. Cal. 2015) (citing 7 Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 1653 (3d ed. rev. 2014)) (citation modified); *see also League to Save Lake Tahoe*, 558 F.2d at 917.

This Circuit has held that claims may arise from the same transaction or occurrence when they share a "logical relationship." *Pablo Sequen v. Kaiser*, No. 25-CV-06487-PCP, 2025 WL 3275602 at *3 (N.D. Cal., Nov. 24, 2025) (quoting *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974)). Furthermore, this Circuit has recognized that claims arising from a "systematic pattern of events" can satisfy the "same transaction or occurrence" requirement of Rule 20(a)(2). *See, e.g., Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997); *Almont Ambulatory Surgery Center, LLC*, 99 F. Supp. 3d at 1188. This standard reflects the recognition that Defendants' conduct may be unified not by a single discrete event but by participation in a common scheme, policy, or practice.

The second prong of Federal Rule of Civil Procedure 20 (a)(2)(B) requires that a question of law or fact common to all defendants must arise in the action. That said, Rule 20 does not require that *all* questions of law and fact raised by the dispute be common. *Russo v. Fed. Med. Servs., Inc.*, 756 F. Supp. 3d 748, 754 (N.D. Cal. 2024) (citation modified). This is because "the purpose of Rule 20(a) is to identify those shared issues that will collectively advance the prosecution of multiple claims in a joint proceeding." *Id.* (citing *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1115 (9th Cir. 2018)) (citation modified). Where courts are satisfied that the common question of fact and law raised by the complaint will "materially advance" joint litigation, joinder is permissible. *Russo*, 756 F. Supp. 3d at 754.

Because joinder is proper under Federal Rule of Civil Procedure 20, Defendants' request for severance fares no better under Rule 21, which gives courts discretion to deny the severance where doing so would promote judicial economy or convenience, or prevent prejudice. Certainly, Plaintiffs acknowledge that the Court has the discretion to sever defendants from an action even where permissible joinder is proper, but this is not a proper case for that exercise of such discretion. Typically, where joinder is otherwise permissible, courts exercise discretion to sever in circumstances where "joinder would instead confuse and complicate the issues for all parties

involved" or cause unfair prejudice to the defendants. *See, e.g., Wynn v. National Broadcasting Company*, 234 F. Supp. 2d 1067, 1088 (C.D. Cal. 2002). Those concerns do not present themselves here. In this Circuit, courts have declined to sever claims that arise from a logically related course of conduct and involve overlapping factual and legal questions because doing so would result in duplicative proceedings and risk inconsistent adjudications. *See e.g.*, *Lindora, LLC v. Isagenix Int'l, LLC*, 198 F. Supp. 3d 1127, 1150-52 (S.D. Cal. 2016) (denying severance due to overlapping factual and legal issues underlying claims, willfulness of alleged infringement, overlapping witnesses and evidence, and the court's ability to mitigate prejudice through, *e.g.*, jury instructions).

### A.    Plaintiffs' Claims Arise from the Same Series of Transactions or Occurrences

Plaintiffs' claims satisfy Rule 20's "same transaction" requirement. In the Ninth Circuit, this requirement "refers to similarity in the factual background of [the] claim; claims that arise out of a systemic pattern of events and have a very definite logical relationship." *Hubbard v. Houghland*, No. 09-0939, 2010 WL 1416691, at *3 (E.D. Cal. Apr. 5, 2010) (citation modified); *see also Pablo Sequen*, 2025 WL 3275602 at *3. "'[T]ransaction' is a word of flexible meaning." *Moore v. N.Y. Cotton Exch.*, 270 U.S. 593, 610 (1926) (holding that two claims arise from the same transaction when there is a "logical relationship" between them). Although alleging infringement of the same copyrights alone is not enough, joinder does not require defendants to have acted in concert. *See In re EMC Corp.*, 677 F.3d 1351, 1359 (Fed. Cir. 2012) (holding that the transaction-or-occurrence text is flexible and can support claims against independent defendants where claims share an aggregate of overlapping facts). The question is instead whether there is a "logical relationship" between the operative facts underlying the separate infringement claims. *Id.* at 1358-59 (vacating and remanding for assessment of an "actual link"); *Mosley*, 497 F.2d at 1333 (holding that Rule 20's "transaction or occurrence" requirement permits "all reasonably related claims" to be tried together); *Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1323 (11th Cir. 2000) (similar), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc).

Here, Plaintiffs allege significant factual overlap stemming from a systematic, industry-wide pattern of events that should permit these reasonably related claims to be tried together. The Amended Complaint alleges that Defendants engaged in a systemic practice of acquiring

copyrighted works from pirate libraries. Am. Compl. ¶¶ 11–16, 42–50. *Each* Defendant downloaded Plaintiffs' works, without authorization, from pirate libraries; those libraries were developed on the dark web for the very purpose of allowing AI companies to train their large language models. *Id.* ¶¶ 2–17, 52–58, 74–91, 233-235. The shadow libraries at issue—LibGen, Z-Library, Bibliotik, and their derivatives—are interconnected repositories that share content and metadata. *Id.* ¶¶ 11–13, 59–91. Books3, *The Pile*, and other datasets used by Defendants are derived directly from these libraries. *Id.* ¶¶ 12-13, 74–91. When Defendants acquired training data from any of these sources, they participated in the same interlocking system of piracy. This interconnection satisfies the "series of transactions or occurrences" requirement of Rule 20(a)(2).

*Each* Defendant then used Plaintiffs' works for unauthorized purposes. There is a very definite logical relationship between Plaintiffs' claims and *each* Defendant's alleged misconduct. The *Almont Ambulatory Surgery Center* decision is instructive. 99 F. Supp. 3d at 1188. There, the court found that claims involving over 400 separate ERISA plans arose from the same series of transactions because they were "part of the larger systematic behavior" by the defendants. *Id.* The court refused to read the complaint narrowly as alleging "thousands of independent and unique" claims and instead focused on the common scheme alleged. *Id.* ("While, strictly speaking, each claim line and attendant claims process does implicate a different 'transaction' of sorts, the Court does not believe the FAC should be read so narrowly. Rather, each discrete claim is part of the larger systematic behavior alleged in the FAC. When viewed in this sense, the Counts against each defendant arise out of the same series of transactions or occurrences."). The same analysis applies here. While Defendants may have used different specific datasets or developed different AI products, these variations are subsumed within the larger systematic behavior alleged: the AI industry's exploitation of pirate libraries to train large language models.

## B.     Common Questions of Law and Fact Predominate

Plaintiffs' claims present multiple common questions of both law and fact that will require the Court's analysis, including but not limited to the following:

- An analysis of the nature and structure of the piracy ecosystem, including LibGen, Z-Library, Bibliotik and their derivatives;

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER

- An analysis of how shadow libraries share and propagate pirated content;

- An analysis of what the AI industry (and each Defendant) knew about the pirated nature of these datasets, and when;

- An analysis of what practices the AI industry (and each Defendant) adopted for acquiring training data, and if those practices reflected awareness of copyright concerns; and

- An analysis of the provenance of the datasets used by Defendants, including Books3, *The Pile*, and related datasets.

These factual questions are common to all claims and each Defendant and will require overlapping discovery and expert testimony.

Critically, the core legal defenses asserted by Defendants also present unified questions that should be resolved across all Defendants in a single proceeding—not fractured into multiple cases.

*Fair Use*:  Each Defendant is expected to assert that its use of copyrighted works to train AI models constitutes fair use under 17 U.S.C. § 107.[5] The fair use analysis will involve the same legal framework and many of the same factual considerations across all Defendants, including the purpose and character of the use (commercial AI training), the nature of the copyrighted works (published books), the amount used (entire works), and the effect on the market for the original works. These issues are common to all claims. The allegedly transformative nature of Defendants' LLMs cannot excuse the fundamental unfairness of having downloaded illegal, unauthorized copies of Plaintiffs' works from locations on the dark web and used them for purposes that one traditionally reads books: to read and learn from them. Fair use should be resolved against Defendants as a matter of law or settled as a jury question in an efficient manner, just as with the briefing on this motion.

Most importantly, the fourth factor—market harm—is "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 566

---

[5] *See, e.g., Bartz v. Anthropic PBC*, 787 F. Supp.3d 1007 (N.D.Cal., 2025); Google's Answer to Amended Complaint, *In re Google Generative AI Copyright Litigation*, No. 5:23-cv-03440 (N.D. Cal. Oct. 16, 2025), ECF No. 262 ("the alleged acts are fair use" at 19); Meta's Motion for Partial Summary Judgment, *Kadrey v. Meta Platforms, Inc.*, No. 3:23-cv-03417-VC, (N.D. Cal. June 25, 2025), ECF No. 501 (arguing the copying of Plaintiffs' works was "transformative and fair" at 18); Perplexity's Answer to Amended Complaint, *Dow Jones & Company, Inc. v. Perplexity AI, Inc.*, 1:24-cv-07984-KPF (S.D.N.Y Oct. 6, 2025), ECF No. 80 ("This is quintessential fair use" at 27).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER

(1985). That inquiry requires courts to examine not only the harm caused by a particular defendant, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market" for the copyrighted works. *Id*. at 568. The Ninth Circuit has reaffirmed this principle, holding that the market-harm analysis "encompasses both (1) the extent of market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market." *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1163 (9th Cir. 2022). There, the Court recognized this factor weighed against fair use "because Pub Ocean's use, if widespread, would destroy the market to license McGucken's works." *Id.* at 1164.

That legal inquiry is dispositive here. Plaintiffs' claims should not be adjudicated in isolation because the relevant question regarding market-harm is not what any single Defendant did alone—but what happens to Plaintiffs' ability to license their works for AI training when all Defendants (who comprise nearly the entire industry) engage in the same conduct across the same market. *See* Am. Compl. ¶¶ 54–57.

*Willfulness*: Plaintiffs allege that each Defendant's infringement was willful, entitling Plaintiffs to enhanced statutory damages. The willfulness analysis will involve common evidence regarding the AI industry's awareness of copyright issues, Defendants' knowledge of the pirated provenance of their training data, and industry practices for addressing copyright concerns. This evidence is substantially overlapping across all Defendants.

Severance would require the Court to evaluate the same evidence, witnesses, and legal arguments multiple times. These inefficiencies and risks of inconsistent adjudication are precisely the considerations—judicial economy, convenience, and fairness—that govern Rule 21 and counsel against severance.

### C.    Judicial Economy Strongly Favors Joinder

"We start with the premise that [Rule 20] regarding permissive joinder is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League to Save Lake Tahoe*, 558 F.2d at 917 (citation

modified). While the joinder of parties lies within the discretion of the district court, the impulse should be "toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 724 (1966).

Here, Defendants are industry leaders that knowingly engaged in nearly identical infringement practices. The claims will undoubtedly involve substantial overlapping discovery regarding the piracy ecosystem, the provenance of training datasets, and Defendants' knowledge and practices. Critically, as discussed in connection with Defendants' anticipated fair use defense, the central inquiry into market impact requires a unified examination of the emerging market for licensed AI training data—of which each Defendant is a principal participant. As a result, each Defendant is not only a party to this action, but a necessary witness in the claims against the others, as their conduct, business practices, and market behavior bear directly on whether widespread use of copyrighted works without authorization harms the relevant licensing market.

Severing the claims would therefore not streamline the case—it would multiply it. Each Defendant would be required to participate as a third-party witness in parallel proceedings, subject to duplicative discovery, depositions, and trial testimony concerning the same market dynamics and technical practices.[6] The parties would be forced to conduct the same discovery multiple times in separate proceedings—an enormous and unnecessary waste of resources. Joinder of the claims and parties here will instead expedite the final determination of these common disputes.

The claims against each Defendant will also require expert testimony on technical issues common to all Defendants, including the operation of shadow libraries, the structure of AI training datasets, and the methods for training large language models. Severing the claims would

---

[6] This inefficiency is not confined to this single action. Plaintiffs' counsel represents scores of additional authors and publishers asserting materially identical claims against these Defendants, including in separately filed actions arising from the same underlying conduct. *See Chicken Soup for the Soul, LLC. v. Anthropic PBC, et al.*, Case No. 3:26-cv-02333-LJC (N.D. Cal.). Severance here would not merely duplicate effort within this case—it would multiply the costs and burdens of litigation exponentially across all related matters.

unnecessarily require duplicative retention of experts and duplicative presentation of expert testimony.

Construed liberally, Rule 20 permits joinder under these circumstances: doing so is consistent with fairness and promotes the efficiencies and streamlined dispute resolution the Rule was meant to encourage.

### D.    Cases Cited In Defendants' Briefing Are Distinguishable

Defendants rely heavily on BitTorrent copyright cases to argue that joinder is improper. These cases are inapposite.

In cases like *Hard Drive Productions, Inc. v. Does 1-188* and similar BitTorrent litigation, courts rejected joinder of anonymous "Doe" defendants alleged to have infringed copyrighted works using peer-to-peer file sharing. 809 F. Supp. 2d 1150, 1157-64 (N.D. Cal. 2011). These courts found that merely using the same technology (BitTorrent) to download the same file was insufficient to establish a series of transactions or occurrences because the defendants acted independently, at different times, without knowledge of each other, and without any coordinated scheme. *Id.*

This case is fundamentally different. Defendants here are not anonymous individuals who happened to use the same technology. They are sophisticated commercial enterprises that knowingly participated in the same piracy ecosystem to obtain training data for their AI models. Unlike BitTorrent users, whose only connection was use of the same protocol, Defendants here share a common connection to the same interlocking network of shadow libraries. Their conduct reflects a systematic, industry-wide practice—not independent, unrelated actions.

Moreover, the BitTorrent cases involved claims against hundreds or thousands of anonymous defendants whose identities and locations were unknown. Courts expressed concern about the practical difficulties of litigating such claims together and the risk that plaintiffs were using joinder to extract settlements from defendants who would find it cheaper to pay than to litigate. None of these concerns applies here. Defendants are identified, well-resourced companies capable of mounting a full defense. Am. Compl. ¶¶ 46–51. There is no risk of abusive joinder tactics.

Similarly, several Defendants rely on *Coughlin v. Rogers* as support that Plaintiffs' claims against them should be severed. 130 F.3d 1348 (9th Cir. 1997). Defendants assert their alleged

13                                                          5:2025-cv-10897-PCP

activity does not meet the "same transaction or occurrence" standard set forth in *Coughlin* and Plaintiffs' claims "merely arise under the same general law." ECF No. 114 at 10. But Defendants' application of *Coughlin* is inapposite. In *Coughlin*, the Ninth Circuit rejected joinder after a fact-specific finding that each plaintiff's claim turned on entirely different facts, timelines, and agency interactions (immigration delays), with no unifying conduct tying them together. *Coughlin,* 130 F.3d at 1350–51. There, joinder was improper because each plaintiff's claim arose from wholly individualized facts with no shared conduct or common evidentiary basis. *Id.* Here, by contrast, Plaintiffs' claims arise from Defendants' common course of conduct—namely, the ingestion, reproduction, and use of copyrighted works in training and operating their AI systems—and present overlapping questions of law and fact, making joinder not only proper but essential to judicial efficiency.

### E.    Defendants' Remaining Arguments Lack Merit

*First*, Defendants argue that severance is warranted because each Defendant will raise "different," "unique," "differing," or "distinct" defenses." ECF No. 94 at 10 (Google Mot.); ECF No. 106 at 2–3 (Anthropic Mot.), ECF No. 112 at 9 (Perplexity Mot.) ECF No. 114 at 11 (Meta Mot.).[7] This argument proves too much and ignores the common defenses that each Defendant will likely assert. If different defenses precluded joinder, virtually no multi-defendant case could proceed—every defendant raises its own defenses. The existence of defendant-specific defenses does not defeat joinder where, as here, the claims arise from the same systematic conduct and present common questions of law and fact. *See Almont*, 99 F. Supp. 3d at 1188 (permitting joinder despite over 400 different ERISA plans with "different terms and exclusions") (citation modified).

---

[7] Anthropic, for example, contends that it has a "lack-of-copying defense unique to Anthropic" because "Plaintiffs allege their works appear only in LibGen and Z-Library . . . yet accuse Anthropic of sourcing data only from Books3." ECF No. 106 at 2. Anthropic's specific argument is undermined by the original Complaint's allegations. ECF No. 1 ("Compl."). The Complaint alleged that the piracy ecosystem is *interconnected*—that Z-Library is derived from LibGen, that Books3 was scraped from Bibliotik, and that these repositories share content. Compl. ¶¶ 43–44.) But Anthropic's argument has also been mooted by the Amended Complaint, which alleges Anthropic copied from LibGen. Am. Compl. ¶¶ 119–129.

*Second*, Anthropic argues that "[t]here is no common period of infringing conduct to adjudicate jointly" because "[a]llegations against other Defendants span 2020 to 2024." ECF No. 106 at 2. This argument misunderstands the "series of transactions or occurrences" standard.

The fact that Defendants accessed the piracy ecosystem at different times does not defeat joinder. A "series" of transactions inherently contemplates events occurring over a period of time. *See* Fed. R. Civ. P. 20(a)(2)(A) ("same transaction, occurrence, *or series of transactions or occurrences*") (emphasis added). In *Almont*, the court permitted joinder of claims involving claims processed at different times under different ERISA plans because they were "part of the larger systematic behavior alleged." 99 F. Supp. 3d at 1188. The same analysis applies here.

*Third*, Defendants contend that joinder would cause prejudice because they are "competitors" who would need to "share competitively sensitive information." ECF No. 94 at 11 (Google Mot.); ECF No. 114 at 14 (Meta Mot.); ECF No. 112 at 10 (Perplexity Mot.) This concern is routinely addressed through protective orders and confidentiality designations—standard tools in complex litigation. The Court has ample authority under Rule 26(c) to protect confidential business information. This is not a basis for severance.

*Fourth*, Perplexity and other Defendants argue, for example, that joinder would cause "jury confusion if the case makes it to trial." (ECF No. 112, Perplexity Mot. at 9.) Plaintiffs disagree. In any event, this case is at the pleading stage. If manageability concerns arise as the case progresses, the Court has ample tools to address them—including separate discovery tracks, phased proceedings, clear jury instructions, or bifurcated trials. *See, e.g., Russo,* 756 F. Supp. 3d at 754 ("[W]hile defendants argue that individualized issues may lead to jury confusion, this presents a problem down the road and the Court retains discretion to order separate trials should it be necessary." (citing Fed. R. Civ. P. 42(b)). Severance at this stage is premature. *See, e.g.*, *DIRECTV, Inc. v. Hosey*, 289 F. Supp. 2d 1259, 1262 (D. Kan. 2003) (holding that severance of claims was inappropriate at pleading stage where case appeared to involve common questions of law, and court could sever cases for trial later in order to prevent delay or prejudice.).  None of the Defendants have set forth reasonable or convincing facts in their Motions to evidence a likelihood of jury

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER

confusion or unfair prejudice to support this Court's exercise of discretionary severance on those grounds.

Instead, the Defendants each argue some self-serving and conclusory version of "guilt by association" which pre-supposes facts yet to be discovered (or disproven) in discovery or jury confusion because of the technical differences between the companies' AI technologies. *See, e.g.*, ECF No. 94 at 12 (Google Mot.) ("There would also be the resulting risk of unfair prejudice, where Plaintiffs' accusations of bad faith conduct against one Defendant might taint the jury's view of actions by a different Defendant."); ECF No. 112 at 9 (Perplexity Mot.) ("The complaint's allegations implicate a thicket of complex and distinct technologies" that "jury instructions cannot cure."). But these concerns are red herrings designed to distract from the simple core truth that the many of the same laws, facts, and witnesses will confirm that each of these Defendants illegally copied vast quantities of copyrighted books without permission and then used those stolen copies to build and train their commercial large language models ("LLMs") and/or optimize their AI products.

**F.     Severance Would Prejudice Plaintiffs**

Severance would significantly prejudice Plaintiffs—six individual rightsholders who brought this action to vindicate their copyright rights against some of the largest technology companies in the world. Requiring Plaintiffs to litigate separate lawsuits would impose an enormous burden: duplicative discovery, duplicative expert testimony, duplicative motion practice, and potentially numerous separate trials.[8]

As the Amended Complaint explains, Plaintiffs "elect not to bring this case as a class action because the Copyright Act entitles them to recover individualized statutory damages" and because they "desire to retain full control of their case and avoid having their rights diluted." Am. Compl. ¶

---

[8] The parties' stipulation to sever OpenAI's claims (ECF No. 98) and corresponding Court Order (ECF No. 99) do not undermine Plaintiffs' opposition, nor bolster the Defendants' contention that severance of the remaining Defendants is warranted. Plaintiffs agreed to sever their claims against OpenAI, Inc., OpenAI OpCo LLC, OpenAI GP LLC, OpenAI Global LLC, OAI Corporation LLC, and OpenAI Holdings LLC (together "OpenAI Defendants") for transfer to the Southern District of New York, only because of the unique procedural posture of the pending Multidistrict Litigation in that district. *See* Transfer Order, *In re OpenAI, Inc., Copyright Infringement Litigation*, 776 F. Supp. 3d 1352 (U.S. Jud. Pan. Mult. Lit. 2025). The remaining Defendants are not similarly situated.

22. Severance would impede this objective by fracturing Plaintiffs' case into multiple proceedings that would be prohibitively expensive and burdensome for individual authors to pursue.

At the very least, Defendants' motions to sever are premature at this stage. *See Make-A-Friend, Inc. v. Bear Mill, Inc.*, No. CV07-276-N-EJL, 2007 WL 9751835, at *3 (D. Idaho Oct. 26, 2007) ("Defendants do not cite to the record or otherwise support their argument beyond using broad, conclusory statements as to Plaintiffs' wholesale severance . . . given the relative early stage of the litigation, references to the record may be impossible.") (citation modified). Perhaps, after the benefit of discovery and a more developed record, Defendants could make a "more germane argument" that would align with the Court's consideration of fundamental fairness. *Id.* (citing *Wynn v. National Broadcasting Co., Inc.*, 234 F. Supp. 2d 1067, 1078 (C.D. Cal. 2002)). If at a later stage of litigation prejudice to Defendants becomes apparent and severance is proper, Defendants may reintroduce a severance request at that point. *See Barnes v. Shartle*, No. CV-18-00491-TUC-CKJ, 2019 WL 4040355 at *2 (D. Ariz. Aug. 27, 2019).

Defendants have not demonstrated that joinder would cause them any prejudice that cannot be addressed through standard case management tools. By contrast, severance would impose substantial prejudice on Plaintiffs while creating inefficiencies for the Court and the parties. The balance of interests weighs strongly against severance.

**G.    In the Alternative, This Court Should Immediately Consolidate Any Actions Not Deemed Related to Other Pending Cases**

If the Court severs any Defendant from this action, this Court should exercise its discretion to consolidate the severed cases. More specifically, the Court should direct the Clerk to open new dockets for any such severed Defendant, and to refile the operative pleading and any response to the Complaint. Once the dockets are open—and after other courts in this district with pending copyright actions against certain Defendants consider whether to deem any of the then-severed cases related to another pending matter—this Court should consolidate all severed cases not deemed related to a separate pending matter.

This Court has discretion to consolidate cases for discovery and for trial under Rule 42 where, as here, venue is proper and there is "a common question of law or fact." Fed. R. Civ. P.

42(a); *see* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2382 (3d ed. rev. 2025) ("[T]he existence of a common question by itself is enough to permit consolidation under Rule 42(a), even if the claims arise out of independent transactions."). Exercising this discretion is appropriate here given the predominance of common questions of law and fact. *See supra* at Section III.B.

Should this Court sever any Defendant, dismissal is unwarranted here. Fed. R. Civ. P. 21 ("Misjoinder of parties is not a ground for dismissing an action."). In ordering severance, Courts in this District have directed the Clerk to open a new docket, refile the same operative pleadings, and docket the response to the complaint. *See, e,g., Arteris S.A.S. v. Sonics, Inc.*, No. C 12-0434 SBA, 2013 WL 3052903, at *8 (N.D. Cal. June 17, 2013) (directing the Clerk of the Court to "assign a new case number for the severed claims," assign the case to the same judge, and "file the operative pleadings in the instant action in the new case," including the complaint, defendant's first amended answer and counterclaims, and plaintiff/counterclaim defendant's answer to the counterclaims); *Smith v. Trexler,* No. 13-CV-01052-SBA (PR), 2016 WL 925851, at *7 (N.D. Cal. Mar. 11, 2016) ("The Clerk of the Court shall open a new action, and file a copy of the Amended Complaint and copies of the Court's service order in this action as well as this Order in the new action.").[9] Ordering the opening of new dockets for any severed cases will promote judicial economy and prevent delays in the litigation, without prejudicing Defendants.

As the case progresses, the Court can exercise continuing discretion with respect to what organization will be most efficient and fair.

---

[9] *Am. Small Bus. League v. United States Off. of Mgmt. & Budget*, No. 20-CV-07126-DMR, 2021 WL 4459667, at *4 (N.D. Cal. Apr. 21, 2021) ("The Clerk of Court shall open a new case with a separate case number. No additional filing fee is due. The new case shall be assigned to the undersigned, and this order shall be the first docket entry."); *San Francisco Tech., Inc. v. Adobe Sys. Inc.*, No. C 09-6083 RS, 2010 WL 1463571, at *4 (N.D. Cal. Apr. 13, 2010) ("The Clerk shall open new case numbers for each of the following, all to be assigned to the undersigned, and shall file a copy of the complaint and this order in each.").

## IV.    CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motions to Sever (ECF Nos. 94, 106, 112, 114, 115). In the alternative, Plaintiffs ask the Court to deem the cases related and to consolidate the cases for discovery and trial under Rule 42.

Dated: March 18, 2026

By: */s/ Kyle Roche*
**FREEDMAN NORMAND FRIEDLAND LLP**
Devin (Velvel) Freedman (*pro hac vice*)
vel@fnf.law
Kyle Roche (*pro hac vice*)
kroche@fnf.law
Alex Potter (*pro hac vice*)
apotter@fnf.law
155 E. 44th Street, Ste 915
New York, NY 10017
T: (646) 494-2900

**STRIS & MAHER LLP**
Elizabeth Brannen (SBN 226234)
ebrannen@stris.com
John Stokes (SBN 310847)
jstokes@stris.com
Lauren Martin (SBN 294367)
lmartin@stris.com
17785 Center Court Dr N, Ste 600
Cerritos, CA 90703
T: (213) 995-6800
F: (213) 261-0299

Bridget Asay (*pro hac vice*)
basay@stris.com
15 East State Street, Ste 2
Montpelier, VT 05602
T: (802) 858-4285

Christopher M. Rigali (*pro hac vice*)
crigali@stris.com
Jacqueline Sahlberg (*pro hac vice*)
jsahlberg@stris.com
1717 K St NW Ste 900
Washington, DC 20006
T: (202) 800-5749

*Counsel for Plaintiffs*